**2023 WI App 57**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

| | |
|---|---|
| Case No.: | 2022AP887 |

Complete Title of Case:


**JEFFERY PRUETT,**

**PLAINTIFF-RESPONDENT,**

**V.**

**WESTCONSIN CREDIT UNION,**

**DEFENDANT-APPELLANT.**


| | |
|---|---|
| Opinion Filed: | October 24, 2023 |
| Submitted on Briefs: | February 22, 2023 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Gill, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *John L. Pollock* of *Litchfield Cavo, LLP*, Milwaukee, and *James R. Branit* and *Jason E. Hunter* of *Litchfield Cavo, LLP*, Chicago, Illinois, pro hac vice. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Nathan E. DeLadurantey* of *DeLadurantey Law Office, LLC*, Brookfield, and *Vess A. Miller* of *Cohen & Malad, LLP*, Indianapolis, Indiana, pro hac vice. |

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## October 24, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.**

Appeal No. **2022AP887**

**STATE OF WISCONSIN**

Cir. Ct. No. **2021CV158**

**IN COURT OF APPEALS**

JEFFERY PRUETT,

PLAINTIFF-RESPONDENT,

V.

WESTCONSIN CREDIT UNION,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Dunn County: LUKE WAGNER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 STARK, P.J. Jeffery Pruett filed a class action complaint alleging that WESTconsin Credit Union (WCU) had improperly charged and collected fees

from its members.[1]  In response, WCU filed a motion to compel arbitration based upon an Arbitration and Class Action Waiver Agreement (the Arbitration Clause) that WCU added to its Membership and Account Agreement (the Agreement) in 2021.  The Arbitration Clause provided that either WCU or a member may compel arbitration in a dispute between the parties, subject to some exceptions not relevant here, and withdrew the right for its members to participate in a class action, as either a class representative or a class member.  The Arbitration Clause applied to "*any dispute* between us concerning your Membership, your accounts, or the services or products related to your accounts[,]" meaning, as WCU argues, the amendment had retroactive application. (Emphasis added.)  WCU alleges that Pruett received notice of the Arbitration Clause, and it further argues that Pruett agreed to the amendment by failing to opt out of its application using the specified procedure—i.e., Pruett's silence and continued use of his account signaled his assent to the Arbitration Clause.

¶2     WCU appeals from the circuit court order denying its motion to compel arbitration pursuant to WIS. STAT. § 788.02 (2021-22).[2]  The issues on appeal, according to WCU, are whether:  (1) WCU's contractual authority to change the terms of the Agreement permitted it to add the Arbitration Clause; (2) Pruett's failure to opt out of the Arbitration Clause and his continued use of his WCU account constituted his agreement to the terms of the Arbitration Clause; (3) the Arbitration Clause applies retroactively to claims that accrued before WCU added the clause; (4) the retroactive application of the Arbitration Clause is unreasonable

---

[1] WCU is a Wisconsin credit union with its headquarters in Menomonie, Wisconsin. Pruett has been a WCU member since 1991.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

and in violation of the contractual duty of good faith and fair dealing; and (5) the language in the Agreement is sufficiently clear to allow an opportunity for a member to timely opt out of the Arbitration Clause.

¶3    We conclude that WCU's contractual authority to change the terms of the Agreement did not permit it to add the Arbitration Clause, which we determine contained new terms that the parties did not address or contemplate in the original contract. Further, Pruett did not affirmatively assent to the Arbitration Clause by his failure to opt out of its provisions and continued use of his account; therefore, the clause cannot be enforced against Pruett. For the reasons that follow, we affirm the circuit court's decision.

## BACKGROUND

¶4    Pruett commenced this class action lawsuit on July 19, 2021, alleging that WCU improperly charged its members certain overdraft fees between 2017 and 2020. Pruett's complaint alleged multiple counts of breach of contract, unjust enrichment, and a violation of the Wisconsin Deceptive Trade Practices Act, under WIS. STAT. § 100.18. Pruett sought monetary damages, restitution, and injunctive and declaratory relief. The merits of those claims are not before us on appeal.

¶5    Instead, this appeal concerns the terms and conditions of the Agreement and whether WCU's 2021 modification of that Agreement requires that the merits of this dispute be resolved by arbitration of only Pruett's claims, rather than by the circuit court in this class action lawsuit. As WCU explains, its relationship with its members is governed by its bylaws as well as the terms and conditions of the Agreement. It is undisputed that Pruett opened his account with WCU in 1991, and he agreed to comply with the terms and conditions of the Agreement at that time. It is also undisputed that at the time Pruett opened his

account and at the time the improper fees alleged in the complaint were assessed, there was no arbitration agreement between Pruett and WCU.[3] The Agreement did, however, include a "Notice of Amendments" section (hereinafter, change-of-terms provision), which stated:

> Except as prohibited by applicable law, we may change the terms of this Agreement. We will notify you of any change in terms, rates, or fees as required by law. We reserve the right to waive any term of this Agreement. Any such waiver shall not affect our right to future enforcement.

¶6      WCU claims that on or about April 27, 2021, it sent "notice of changes to its membership agreement to its members," which "advised members that WCU was implementing an Arbitration and Class Action Waiver Agreement … that would become effective 60 days after the member's receipt of the Notice." WCU claims that the Arbitration Clause was permitted under the "Notice of Amendments" clause of the May 2018 version of the Agreement in effect at the time. The mailing sent to members included: (1) "a document titled 'Important Information Regarding Your Account at [WCU]'" (the Notice); (2) the amended Agreement; and (3) "the amended Electronic Fund Transfers Agreement and Disclosure." The Notice was sent to WCU's members "at the valid, deliverable mailing address on file for each member."

¶7      The Notice informed members of "important changes" with the Agreement, including the added Arbitration Clause.[4] The Notice provided:

> **IMPORTANT:** The Arbitration and Class Action Waiver Agreement provision is effective within 60 days of this notice (the "Effective Date") unless you opt-out in

---

[3] The record includes both a December 2016 and a May 2018 version of the Agreement, neither of which reference arbitration.

[4] The changes also included "[e]nhanced language" about overdraft and nonsufficient fund fees charged by WCU.

4

accordance with the specified opt-out process described at Section 35c of the enclosed Account Agreement Arbitration and Class Action Waiver Agreement. **THE ARBITRATION AND CLASS ACTION WAIVER AGREEMENT APPLIES TO ALL CLAIMS THAT ARE FILED OR INITIATED ON OR AFTER THE EFFECTIVE DATE, EVEN IF THE CLAIM ARISES OUT OF, AFFECTS, OR RELATES TO CONDUCT THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.** If a claim is filed or initiated prior to the Effective Date, the Arbitration and Class Action Waiver Agreement will not apply to such claim.

YOU WILL INDICATE YOUR AGREEMENT TO THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER BY (1) FAILING TO OPT-OUT AS EXPLAINED AT SECTION 35C OF THE ENCLOSED ACCOUNT AGREEMENT ARBITRATION AND CLASS ACTION WAIVER AGREEMENT, AND (2) CONTINUING YOUR MEMBERSHIP WITH WESTCONSIN CREDIT UNION. ALL CHANGES ARE EFFECTIVE AS OF **APRIL 26, 2021**.

¶8 The Arbitration Clause, in turn, detailed the terms of the added provision and the opt-out procedure. Section 35.a. provided, in pertinent part, that

[e]xcept if you opt-out as provided in subsection (C) below, either you or us may elect, without the other's consent, to require that any dispute between us concerning your Membership, your accounts, or the services or products related to your accounts and Membership be resolved by binding arbitration, except for those disputes specifically excluded below.

Section 35.b. further provided, in pertinent part: "Unless prohibited by applicable law, arbitration will be solely brought in your individual capacity and be solely between you and us. Neither you nor we have the right to participate in a class action in court or arbitration, either as a class representative or class member." The Arbitration Clause explained that "[i]f you agree to be bound by the above Arbitration and Class Action Waiver Agreement, then no action is needed on your part." It also included the procedure for opting out:

> If you do not agree to be bound by this Arbitration and Class Action Waiver Agreement, you must send us written notice that you want to opt out of this provision of your Account Agreement within 60 days of account opening or within 60 days of receiving this notice, whichever is sooner.

¶9     Pruett asserts that he never agreed to the Arbitration Clause. He averred, by affidavit, that he had "never before seen or read the Arbitration Documents" and that he had "never signed or seen or heard anything about arbitration from [WCU], and [he] never agreed to arbitration with" WCU.[5] Accordingly, it is undisputed that Pruett took no action to opt out of the Arbitration Clause.

¶10     On September 15, 2021, WCU filed its motion seeking to compel this class action litigation to individual arbitration and stay court proceedings based on the Arbitration Clause. As the circuit court observed, "WCU's [m]otion attempts to apply the April 2021 Arbitration Clause retroactively to the fees in [Pruett's class action] [c]omplaint that were assessed and collected in 2017, 2018, and 2020, to require [Pruett] to arbitrate his claims for actions that occurred prior to the existence of the Arbitration Clause."

¶11     Pruett opposed the motion, arguing that WCU had failed to meet its burden to show that a valid arbitration agreement was ever formed. Specifically, Pruett argued that the Arbitration Clause was not a valid agreement to arbitrate for numerous reasons, including that: (1) "at the time of the transactions WCU's agreement with customers did *not* contain an arbitration clause or any other restriction on [Pruett's] ability to file a class action in this [c]ourt"; (2) "WCU never had authority under the original agreement to unilaterally add a wholly new term"

---

[5] Although Pruett states that he never saw the Notice or amended Agreement, he does not dispute (or does not present evidence in response to) WCU's assertion that the documents were mailed to him.

because the "Notice of Amendments" clause uses "change" not "add"; (3) "the duty of good faith and fair dealing prevented WCU from unilaterally adding an arbitration provision never contemplated in the original agreement to re-capture rights from" Pruett; (4) "WCU never provided reasonable notice of its addition of the arbitration clause, so it cannot show silence or inaction constitutes assent and agreement"; and (5) "WCU cannot show that [Pruett] not 'opting out' of the new arbitration clause constitutes assent" based on WCU's use of the phrase "whichever is sooner" because the opening of his account in 1991 would have been the "sooner" date, making timely opting out impossible. WCU replied, and each party submitted affidavits and supplemental authority involving cases outside this jurisdiction addressing similar factual situations.

¶12    After a nonevidentiary hearing, the circuit court entered its written order denying WCU's motion to compel arbitration. The court's decision was based on several factors. First, it concluded that WCU's attempts "to apply the Arbitration Clause retroactively to claims that accrued before the clause came into existence" failed because "the language of the Arbitration Clause itself does not state that the clause will apply retroactively to accrued claims." WCU argued that the Notice, which stated that the Arbitration Clause "applies to all claims that are filed or initiated on or after the effective date, even if the claim arises out of, affects, or relates to conduct that occurred prior to the effective date," operated to apply the Arbitration Clause retroactively to Pruett's claims. (Formatting altered.) The court disagreed, noting that "it is the language of the Arbitration Clause itself—not the cover letter—that governs the parties' agreement." In general, the court found "particularly persuasive" the reasoning of the Sixth Circuit Court of Appeals in *Sevier County Schools Federal Credit Union v. Branch Banking and Trust Co.*, 990 F.3d 470 (6th Cir. 2021), which we discuss in further detail below.

7

¶13    Next, the circuit court concluded that WCU's attempts to apply the Arbitration Clause retroactively were "not reasonable and would violate the duty of good faith and fair dealing."  Finally, the court determined that Pruett's failure to opt out of the Arbitration Clause did not evidence his assent to be bound because the deadline had already passed for Pruett to opt out at the time the Notice was issued.  WCU appeals.[6]

## DISCUSSION

¶14    As noted above, on appeal, WCU presents five issues for our review. The first question before us—one of first impression in this state—is whether the change-of-terms provision in the parties' Agreement provided WCU with the contractual authority to unilaterally add the Arbitration Clause to the parties' contract.

¶15    WCU's briefing is ambiguous as to the second question—whether Pruett's failure to opt out of the Arbitration Clause and his continued use of his WCU account constitutes his agreement to the terms of the Arbitration Clause. WCU predominantly argues that the change-of-terms provision authorized it to add the Arbitration Clause: "Specifically, [WCU] implemented the arbitration provision pursuant to its previously agreed-upon authority to amend its Agreement and provided Pruett with notice clearly directing his attention to the addition of the arbitration provision, its application to '*any* dispute' related to his membership and accounts, and the opt-out procedure."  In general, then, WCU relies on what the Agreement allowed it to do.  Elsewhere, however, WCU argues that, wholly

---

[6] A circuit court's order denying a request to compel arbitration and stay a pending lawsuit—a WIS. STAT. § 788.02 special proceeding—is final for purposes of appeal.  ***L.G. v. Aurora Residential Alts., Inc.***, 2019 WI 79, ¶¶1, 22, 26-27, 387 Wis. 2d 724, 929 N.W.2d 590.

separate from the change-of-terms provision, WCU was authorized to modify its contract with its members pursuant to general principles of contract law: "No matter what the original contract provided, parties can certainly add new terms—including arbitration provisions—by the same means they entered into a contract to begin with: by offer, acceptance and consideration." While this argument seemingly relates more to the first question as opposed to the second, we will nonetheless address both questions.

¶16 As to the first question, we conclude, for the reasons that follow, that WCU's contractual authority to "change the terms of this Agreement" did not authorize it to unilaterally add the Arbitration Clause absent evidence that the Arbitration Clause was the type of change contemplated by the parties at the time of the original Agreement. No evidence has been presented that the Arbitration Clause involved terms that were previously in the Agreement or were contemplated by the parties at its inception. Therefore, WCU did not have the contractual authority under the change-of-terms provision to unilaterally add the Arbitration Clause, and the Arbitration Clause is not a part of WCU's contract with Pruett.

¶17 As to the second question, to the extent WCU argues that Pruett's failure to opt out of the Arbitration Clause and his continued use of his WCU account constitutes his assent to the modified Agreement, we disagree. WCU's purported offer to modify its Agreement with its members did not provide sufficient clarity to reasonably convey to Pruett what was required such that we can infer assent to the modification from his silence. Therefore, the Arbitration Clause may

not be enforced against him.[7] Accordingly, the circuit court properly denied WCU's motion to compel arbitration. *See* ***State v. Holt***, 128 Wis. 2d 110, 124, 382 N.W.2d 679 (Ct. App. 1985) (we may affirm based on reasoning other than that used by the circuit court if the court reached the proper result), *superseded by statute on other grounds*, WIS. STAT. § 940.225(7).

## I. The Law of Arbitration in Wisconsin

¶18    "[A]rbitration ordinarily is understood to refer to a proceeding voluntarily undertaken by parties who want a dispute determined on the merits of the case by an impartial decision maker of their choosing, which decision the parties agree to accept as final and binding." ***Stradinger v. Whitewater***, 89 Wis. 2d 19, 31, 277 N.W.2d 827 (1979). Accordingly, "[a]rbitration agreements are 'a matter of contract.'" ***Midwest Neurosciences Assocs., LLC v. Great Lakes Neurosurgical Assocs., LLC***, 2018 WI 112, ¶40, 384 Wis. 2d 669, 920 N.W.2d 767 (citation omitted); *see also* ***Employers Ins. of Wausau v. Jackson***, 190 Wis. 2d 597, 610-11, 527 N.W.2d 681 (1995) ("[A]rbitration is meant to be a swift and inexpensive process that is guided by a contractual agreement."). As a result, arbitration agreements—including the validity of such agreements—are subject to principles of state contract law to determine whether an agreement to arbitrate has been formed

---

[7] Given our decision on the first two questions, we conclude that it is unnecessary for us to separately resolve the three remaining issues. WCU argued that the Arbitration Clause "encompasses all claims and must therefore apply retroactively." As noted above, the circuit court did not agree. Because we conclude that there was no valid agreement to arbitrate between the parties, we need not resolve the question of whether the Arbitration Clause would be retroactive. For the purpose of our decision and based on WCU's assertions, however, we will assume, without deciding, that the Arbitration Clause would apply retroactively.

We resolve the two remaining issues—whether retroactive application of the Arbitration Clause is unreasonable and in violation of the contractual duty of good faith and fair dealing and whether the language in the Agreement is sufficiently clear to allow an opportunity for a member to timely opt out of the clause—within our review of the first two questions.

in the first instance and to determine the scope of the arbitration provision as expressed by the language of the agreement. *See Midwest Neurosciences Assocs.*, 384 Wis. 2d 669, ¶45; *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733-34 (7th Cir. 2002); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009); *see also Employers Ins.*, 190 Wis. 2d at 611 n.5 (noting that Wisconsin courts may look to "federal court interpretations" of the Federal Arbitration Act "as an aid in the resolution" of cases regarding the Wisconsin Arbitration Act).

¶19    In its briefing before this court, WCU focuses on the admittedly strong federal and Wisconsin policies favoring arbitration. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985); *First Weber Grp., Inc. v. Synergy Real Est. Grp., LLC*, 2015 WI 34, ¶24, 361 Wis. 2d 496, 860 N.W.2d 498. "Wisconsin's 'policy of encouraging arbitration as an alternative to litigation,' however, is not limitless." *Midwest Neurosciences Assocs.*, 384 Wis. 2d 669, ¶42 (citation omitted). "[P]arties cannot be 'required to submit any dispute to arbitration unless [they have] agreed to do so'" and "only those disputes that the parties have agreed to so submit to arbitration are relegated to proceed in that forum." *Id.*, ¶¶40, 43 (alteration in original; citations omitted); *see also AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit." (citation omitted)); *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) ("'[P]olicy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules."). Thus, the policy favoring arbitration applies only where the parties have indeed agreed to arbitration. *See Morgan*, 142 S. Ct. at 1713 ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration."); *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("In other words,

while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.").

¶20    A motion to compel arbitration, therefore, "involves issues of contract interpretation and a determination of substantive arbitrability, questions of law we review de novo." *Cirilli v. Country Ins. & Fin. Servs.*, 2009 WI App 167, ¶10, 322 Wis. 2d 238, 776 N.W.2d 272.  A court, not an arbitrator, determines whether an agreement to arbitrate has been formed.  *Midwest Neurosciences Assocs.*, 384 Wis. 2d 669, ¶¶43, 65.  The burden to prove that the parties agreed to arbitration rests with the moving party.  *See id.*, ¶80.

## II.   The Change-of-Terms Provision in the Agreement Did Not Authorize WCU to Add the Arbitration Clause.

¶21    First, Pruett argues that WCU did not have the authority to add the Arbitration Clause without his express agreement because "[t]he plain language of WCU's change-of-terms [c]lause permitted WCU only to unilaterally 'change terms of this Agreement,' not to unilaterally 'add new terms that are not the subject of this Agreement,' such as the Arbitration Clause."  Conversely, WCU argues that the change-of-terms provision is not so limited; instead, changing or amending a contract "necessarily includes adding new terms or removing old terms."  According to WCU, the language of the change-of-terms provision was broad enough to encompass adding the Arbitration Clause through the notice provisions in the original Agreement.

¶22    Although the question before us is an issue of first impression in this state, the issue itself is not a novel one and has been addressed by courts in other jurisdictions.  *See State v. Muckerheide*, 2007 WI 5, ¶7, 298 Wis. 2d 553, 725

N.W.2d 930 ("Although a Wisconsin court may consider case law from such other jurisdictions, obviously such case law is not binding precedent in Wisconsin, and a Wisconsin court is not required to follow it."). As noted above, the circuit court relied on the Sixth Circuit's decision in *Sevier* as persuasive authority in support of its decision to deny WCU's motion. In *Sevier*, the case also involved a later-added arbitration provision where the account holders were notified of the amendment to the terms of their agreement and told that continued use of their account with the Branch Banking & Trust Company constituted acceptance. *Sevier*, 990 F.3d at 473-74, 476-77. In reversing the district court's order to compel arbitration, the Sixth Circuit explained that the district court improperly "place[d] the burden on the [consumers] to … object to a company's unilaterally adopted arbitration policy or risk being found to have agreed to it. This is not how contracts are formed." *Id.* at 477-78 (citation omitted). According to the court, the company's

> discretion under the original change-of-terms provision to amend the terms is not unlimited, but is subject to two requirements: (1) that any changes be reasonable, and (2) that [the company] exercise its discretion to make such changes in a manner consistent with the implied covenant of good faith and fair dealing.

*Id.* at 479.

¶23 The Sixth Circuit determined that neither of these requirements had been satisfied. In addressing the reasonableness of the arbitration provision, the Sixth Circuit observed that it "could not 'assume … that notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a significant change regarding matters that were not addressed in the original contract at all.'" *Id.* (citation omitted). The court also noted that there was no opt-out provision available. *Id.* at 480. Further, it concluded that the late addition of the arbitration provision violated the implied covenant of good faith and fair dealing

13

because the provision was a significant change—deprivation of the right to a jury trial and to select a judicial forum for dispute resolution—not contemplated in the original contract. *Id.* at 480-81. The company "did not act reasonably when it added the arbitration provision years after the Plaintiffs' accounts were established by [its predecessor], thus violating the implied covenant of good faith and fair dealing in its attempt to use the original change-of-terms provision to force the Plaintiffs to arbitrate." *Id.* at 480.

¶24    In reaching its decision, the *Sevier* court relied heavily on *Badie v. Bank of America*, 79 Cal. Rptr. 2d 273 (Cal. Ct. App. 1998). In *Badie*, the California Courts of Appeal found that a similar change-in-terms provision did not give the bank the right to add an arbitration provision to the account holder's original agreement. *Id.* at 278, 291. There, too, the bank added an arbitration clause to its credit card agreements and gave notice via a mailing to cardholders in their monthly statements. *Id.* at 275-76.

¶25    The *Badie* court explained that "a party with the unilateral right to modify a contract" does not have "carte blanche to make any kind of change whatsoever as long as a specified procedure is followed." *Id.* at 281. Instead, the change must be "a modification whose general subject matter was anticipated when the contract was entered into." *Id.*

> Where, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an "objectively reasonable" manner when it attempts to "recapture" a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.

*Id.* at 284. According to the court, "there [was] nothing about the original terms that would have alerted a customer to the possibility that the [b]ank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* [alternative dispute resolution] on the customer." *Id.* at 287. To the contrary, "the method and forum for dispute resolution—a matter which is collateral to that relationship—[was] not discussed at all" in the original agreement. *Id.* Therefore, the court reasoned that it could not assume that "notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a significant change regarding matters that were not addressed in the original contract at all." *Id.* at 282.

¶26 Likewise, the court in *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004), as cited by the circuit court and Pruett, also relied on the reasoning in *Badie* to reach the same result. In *Sears*, the issue was whether Sears Roebuck and Co. validly added an arbitration provision to the terms of its credit card agreement. *Sears*, 593 S.E.2d at 426. The original agreement "contained a 'Change of Terms' provision" that stated: "As permitted by law, [Sears] has the right to change any term or part of this agreement, including the rate of *Finance Charge*, applicable to current and future balances. [Sears] will send me a written notice of any such changes when required by law." *Id.* The cardholder agreement "made no reference to arbitration or any other dispute resolution procedures and did not in any manner address the forum in which a customer could have disputes resolved." *Id.* As in this case, Sears averred that it sent this notice to the defendant of the addition of an arbitration provision to the defendant's credit card agreement, but the defendant claimed that she was "unaware of any correspondence regarding changes to her account." *See id.*

15

¶27    Applying Arizona law, as required by the credit card agreement, the North Carolina Court of Appeals held, based on its review of Arizona appellate decisions regarding standardized contracts and modifications to those contracts, that "the Arizona appellate courts would adopt the same reasoning as the *Badie* court and would reach the same result." *Sears*, 593 S.E.2d at 428-29. The court observed that, according to one commentator, "a breach of the requirement of good faith occurs 'when discretion is used to recapture opportunities forgone upon contracting'" and that "[c]onsistent with good faith, a party may exercise a discretionary power 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.'" *Id.* at 432 (citing Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 373 (1980)). This position, according to the court, is "consistent with the definition of bad faith set out in the Restatement (Second) of Contracts 2d § 205 cmt. d (1981)[,]" which includes "abuse of a power to specify terms." *Sears*, 593 S.E.2d at 432 (citation omitted).

¶28    As a result, the court concluded that reading the "Change of Terms" provision to "permit Sears to add wholly new terms to its cardholder agreement" "arguably would render the contract illusory" because one party would have the power to unilaterally add any provisions. *Id.* Thus, it held that "the parties did not intend that the 'Change of Terms' provision in the original agreement would allow Sears to unilaterally add completely new terms that were outside the universe of the subjects addressed in the original cardholder agreement." *Id.* at 434. Therefore, "[b]ecause the arbitration clause was a wholly new term that did not fall within the universe of subjects included in the original agreement, [Sears] did not have

authority under its 'Change of Terms' provision to condition continued use of its credit card on acceptance of the arbitration clause." *Id.*

¶29     In *Maestle v. Best Buy Co.*, No. 79827, 2005-Ohio-4120, 2005 WL 1907282 (Ohio Ct. App. Aug. 11, 2005), also cited by Pruett, the Ohio Court of Appeals reached the same conclusion.  There, the original cardholder agreement was amended, based on a change-of-terms provision, to include a "comprehensive arbitration provision." *Id.* at *1.  The *Maestle* court ultimately concluded that the change-of-terms provision did not authorize the addition of an arbitration clause, for two reasons.  First, "since the amendment provision referenced only changes to payments, charges, fees and interest," the cardholders could not anticipate amending the agreement to add an arbitration clause. *Id.* at *6.  Second, "nowhere in the contract is there a clause addressing forums of dispute." *Id.*  Accordingly, the court concluded that "there was no 'meeting of the minds' as to inclusion of the arbitration clause at the inception of the contract." *Id.*

¶30     The court in *Follman v. World Financial Network National Bank*, 721 F. Supp. 2d 158 (E.D.N.Y. 2010), as Pruett notes, reached the same result.  That case, too, involved a credit card account cardholder agreement. *Id.* at 159.  As the cardholder agreement contained a choice-of-law provision, the United States District Court for the Eastern District of New York applied Ohio law, including the *Maestle* decision, to determine whether a valid arbitration agreement existed between the parties. *Follman*, 721 F. Supp. 2d at 161.  In doing so, it noted that "*Maestle* is properly read as imposing substantive limitations on the type of terms that may be added or amended pursuant to a change-of-terms provision in a cardholder agreement." *Follman*, 721 F. Supp. 2d at 164.  Importantly, the court failed to find differences in the phrasing of the change-of-terms provisions significant: "Unlike the change-of-terms provision before the *Maestle* court, the

17

instant provision specifies that defendant may 'add,' in addition to change, the terms of the cardholder agreement. The change-of-terms provision in *Maestle*, on the other hand, only permitted the Bank to 'change or amend,' but not add, terms." *Follman*, 721 F. Supp. 2d at 165. According to the court, "the issue is not whether defendant may *add* new terms, but whether the terms added are the *types of terms* the contract contemplated defendant could add." *Id.*

¶31 Further, the court refused to find a term in the original cardholder agreement that "set out a cardholder's liability for defendant's attorneys' fees and court costs" sufficient to "have permitted plaintiff to anticipate the substantive amendment to her rights that the added arbitration amendment effected." *Id.* at 165-66. According to the court, while the original cardholder agreement explained the defendant's rights in the event that it enforced those rights against a cardholder, the agreement did not "address a cardholder's dispute resolution rights against [the] defendant" and therefore did not "address the same substantive rights that the arbitration provision addresses." *Id.* at 166. Thus, the court concluded that since "the arbitration provision falls outside the scope of the universe of terms contemplated by the original agreement, the change-of-terms provision did not authorize defendant to add it. Accordingly, the arbitration amendment is not part of the agreement between the parties, and defendant may not enforce the provision against plaintiff." *Id.*

¶32 Finally, Pruett cites to *Canteen v. Charlotte Metro Credit Union*, No. 21-CVS-6056, 2021 WL 7967397 (N.C. Super. Ct. Sept. 7, 2021). In *Canteen*, the court addressed a substantially identical change-of-terms provision to the provision at issue in this case. The court found that the use of the word "change" in the provision referred to a "change in the terms of *this* Agreement," but the provision did not "use the word 'add' or indicate any power to unilaterally make a new

agreement." *Id.* at \*5. According to the court, even if the distinction between "change" and "add" rendered the provision ambiguous, the ambiguity would be resolved against the drafter of the agreement—the credit union. *Id.* at \*6. The court further concluded that the credit union "unilaterally added the arbitration provision without obtaining any affirmative assent"; therefore, the court could not

> assume that [the plaintiff's] silence constituted assent because adding a clause stripping accountholders of the right to a jury trial, which was not addressed in the original agreement, is not objectively reasonable and was done to "recapture a foregone opportunity," particularly where [the credit union] is attempting to enforce the clause retroactively to past transactions and existing claims.

*Id.* at \*7 (citations omitted).[8]

¶33 Based on the persuasive reasoning in the aforementioned cases, and under the standard principles of contract law in Wisconsin, we agree with Pruett that WCU's change-of-terms provision in its Agreement did not authorize it to unilaterally add the Arbitration Clause. "Contract interpretation generally seeks to give effect to the parties' intentions." *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶25, 348 Wis. 2d 631, 833 N.W.2d 586. Thus, we begin with the language of the Agreement. "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms," construing it "according to its plain or ordinary meaning" and "consistent with 'what a reasonable person would understand the words to mean under the circumstances.'" *Id.*, ¶¶26, 28 (citation omitted). "We presume the parties' intent is evidenced by the words they chose, if those words are unambiguous." *Id.*, ¶26 (citation omitted). If, however, the terms

---

[8] After the parties' briefing in this case was complete, the North Carolina Court of Appeals reversed the superior court's decision in *Canteen v. Charlotte Metro Credit Union*, No. 21-CVS-6056, 2021 WL 7967397 (N.C. Super. Ct. Sept. 7, 2021). *See Canteen v. Charlotte Metro Credit Union (Canteen II)*, 881 S.E.2d 753 (N.C. Ct. App. 2022). We discuss *Canteen II* in more detail below.

of the contract are ambiguous—in other words, "fairly susceptible of more than one construction"—then "evidence extrinsic to the contract itself may be used to determine the parties' intent." *Id.*, ¶27 (citation omitted).

¶34 As noted above, the change-of-terms provision states that WCU "may change the terms of this Agreement." At issue, then, is the meaning of the word "change." The common definition of the word "change" suggests that something must already exist in order for it to be changed: "to make different in some particular," "to make radically different," "to give a different position, course, or direction to," "to replace with another," "to make a shift from one to another," and "to undergo a modification of." *Change*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/change (last visited October 10, 2023). Thus, according to the plain meaning of the change-of-terms provision in the Agreement, the parties agreed that WCU was authorized to "make different," "replace," or modify the terms that existed already in "this Agreement." The change-of-terms provision does not state that WCU may "add new terms."

¶35 WCU disagrees, arguing that the "language explicitly advises members that [WCU] could change the terms of the Agreement at any time" and that Pruett's "contention that 'change' and 'amendment' of the Agreement means only alterations of existing terms is absurd."[9] In support, WCU cites to *Rudolph v. Wright Patt Credit Union*, 175 N.E.3d 636 (Ohio Ct. App. 2021). There, the

---

[9] WCU supports this contention by speculating that "[t]he Founding Fathers would be surprised to learn that the procedure for adopting 'amendments' to the Constitution in Article V was limited to changing already existing provisions in the Constitution." WCU continues, "Clearly, an amendment to the Constitution includes the possibility of adding entirely new terms, and the same conclusion applies to amendments or changes to any contract or agreement." We agree with Pruett that this comparison is inapt. The construction and interpretation of a contract between private parties is not reasonably analogous under the circumstances to amending the United States Constitution under Article V.

Second District Court of Appeals of Ohio upheld the lower court's decision ordering the case to arbitration after it determined that "while the 2015 agreement lacked an arbitration clause, Rudolph did agree that '[e]xcept as prohibited by applicable law,' [the credit union] could 'change the terms of this Agreement and the other Account Documents at any time.'" *Id.* at 646. The court was not persuaded by Rudolph's argument that a "new" term is not a "change" of terms. *Id.*

¶36 Citing decisions from other jurisdictions, the court noted that the credit union's 2015 agreement did not contain language limiting the specific types of changes that could be made and noted that there was no legal requirement that the contract state that a party may add new terms rather than simply change its terms. *Id.* at 647. Accordingly, the court concluded that because "the 2015 agreement … did discuss enforcement and dispute resolution, … the change was not completely unanticipated" and the plaintiff "could have anticipated that [the credit union] might later change the agreement to add a different avenue of dispute resolution" because the agreement "contained a section specifying where disputes were to be filed." *Id.* at 647, 649.

¶37 Accordingly, WCU not only presents the semantic argument noted above, but it also claims that alternative dispute resolution was contemplated in its Agreement prior to the Arbitration Clause. WCU's Agreement contains a "Governing Law" provision, which states that the laws of Wisconsin govern the Agreement and further states that "you agree that any legal action regarding this

Agreement shall be brought in the county in which the Credit Union is located."[10] Citing to **Rudolph**, WCU argues that "[b]ecause there is a section specifying where disputes must be filed, Pruett should have anticipated that [WCU] would change the Agreement to include an arbitration agreement so that legal actions would be resolved in arbitration rather than in a civil court in a particular county."

¶38    This issue was also addressed by the court in **Canteen v. Charlotte Metro Credit Union (Canteen II)**, 881 S.E.2d 753 (N.C. Ct. App. 2022). As noted previously, *see supra* note 8, after the parties' briefing in this case was complete, the North Carolina Court of Appeals reversed the lower court's decision in **Canteen**. The basis for the court's reversal was that the agreement in that case contained a "Governing Law" provision, which is substantially identical to the governing law provision in this case and which provided:

> This Agreement is governed by … the laws … and regulations of the state in which the credit union's main office is located …. As permitted by applicable law, you agree that any legal action regarding this Agreement shall be brought in the county in which the credit union is located.

**Canteen II**, 881 S.E.2d at 755. The court noted distinctions in the case law where there was no mention of the method or forum for dispute resolutions. **Id.** at 756. Ultimately, the court concluded that

---

[10] Pruett notes that before the circuit court, WCU argued only the state law language—that the laws of Wisconsin govern the Agreement—as a basis for why alternative dispute resolution was previously contemplated. Now, Pruett asserts, WCU argues for the first time on appeal "that additional language in the 2018 Agreement that 'you agree that any legal action regarding this Agreement shall be brought in the county in which the Credit Union is located,' somehow made alternative dispute resolution a 'term of this Agreement.'" *See* **State Farm Mut. Auto. Ins. Co. v. Hunt**, 2014 WI App 115, ¶32, 358 Wis. 2d 379, 856 N.W.2d 633 ("Arguments raised for the first time on appeal are generally deemed forfeited." (citation omitted)); **State v. Rogers**, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) ("We will not, however, blindside trial courts with reversals based on theories which did not originate in their forum."). As we are affirming the circuit court, we will not address the forfeiture issue further.

> the Agreement here did contain a 'Governing Law' provision, which outlined the appropriate choice of law and forum for settling disputes. Plaintiff was therefore on notice that [the credit union] could change this provision to allow for disputes to be settled, not in the court where [the credit union] was located, but rather in another forum, including before an arbitrator.

*Id.*

¶39 We do not find the ***Canteen II*** majority's reasoning persuasive. In this case, we conclude that nothing in the Agreement allowed WCU to add either of the new provisions requiring arbitration of disputes—if requested by WCU or a member—or waiving class action lawsuits. Pursuant to the plain language of the contract, the Agreement may be changed or modified where a term was previously addressed in the Agreement, but WCU may not add entirely new terms not contemplated by the parties. Accordingly, we do not agree with the ***Canteen II*** court's ultimate conclusion that the new term was a change—rather than an addition—to the agreement, nor do we agree with the outcome in that case.

¶40 As that legal framework applies here, there is no question that the contract provides that the laws of the State of Wisconsin apply to the Agreement; however, that statement does not provide for a particular forum to resolve disputes. Further, there is no question that under the Agreement any legal action shall be brought in the county in which the credit union is located. But, again, the Arbitration Clause does not *change or modify* either of those requirements. For example, the Agreement was not modified to apply Illinois law or provide that matters could be heard in all counties of this state, which would encompass modifications or changes to the original Agreement.

¶41 Instead, the Arbitration Clause *adds* substantive limitations to the manner in which a legal action may be heard and the type of claim that can be filed.

23

The Arbitration Clause introduces *additions* to the contract limiting the rights of the parties on issues that were not contemplated in the original Agreement—arbitration and class actions—rather than amending existing terms. *See* RESTATEMENT (SECOND) OF CONTRACTS § 211 cmt. f (AM. L. INST. 1981) ("Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation."). As Pruett argues, "[a] customer who agreed to a term involving the location of the court where he could file suit would not reasonably understand that doing so would permit WCU to later unilaterally remove the right to go to court at all." *See Sears*, 593 S.E.2d at 434 (citing *Badie*, 79 Cal. Rptr. 2d at 289) ("Nothing in the original agreement would have alerted [a party] that by allowing Sears to 'change any term or part' of the agreement, '[the party] might someday be deemed to have agreed to give up the right to a jury trial or to any judicial forum whatsoever."). WCU's suggestion that this reading of the contract is "absurd" has no basis in law given, as Pruett notes, that this "construction is the same one reached by the courts in *Badie*, *Maestle*, *Sears*, and *Sevier*, and it uses the plain meanings of the words WCU chose."[11]

¶42 Additionally, we find the dissent's reasoning in *Canteen II* to be particularly persuasive. The dissent explained that "the Agreement allowed [the credit union] to 'change the terms of *this* Agreement[,]' and stated [the credit union] would notify customers of 'any change in terms,' but did not put customers on notice

---

[11] Even if an argument could be made that the change-in-terms provision in the Agreement was ambiguous, that ambiguity would be construed against WCU. *See Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶27, 348 Wis. 2d 631, 833 N.W.2d 586 ("A contract provision is ambiguous if it is fairly susceptible of more than one construction." (citation omitted)); *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶44, 326 Wis. 2d 300, 786 N.W.2d 15 ("The principle that ambiguities are construed against the drafter is a 'deeply rooted doctrine' of contract interpretation." (citation omitted)).

that it would add additional, uncontemplated terms." ***Canteen II***, 881 S.E.2d at 758 (Arrowood, J., dissenting) (second alteration in original).  Importantly, the dissent explained:

> [N]othing in the Agreement allowed [the credit union] to add new provisions to the Agreement and make those new additions apply retroactively to protect their past actions. The majority's opinion improperly interprets the Agreement to allow for this occurrence and sanctions such behavior by allowing a financial institution to protect itself from actions for which it is already being sued for in other litigation.

***Id.*** (Arrowood, J., dissenting).  The dissent noted that "[t]his view is consistent with the previous holdings of the [c]ourt," citing the court's own prior decision in ***Sears*** where the court concluded that "allowing Sears to 'unilaterally insert' a 'wholly new term' would 'ignore the requirement of good faith implied in all contracts of adhesion[,]' be contrary to 'black letter contract law[,]' and 'render the contract illusory.'" ***Canteen II***, 881 S.E.2d at 758 (Arrowood, J., dissenting) (alterations in original; quoting ***Sears***, 593 S.E.2d at 432).

¶43   Here, by adding the Arbitration Clause to the Agreement and making the added provisions retroactive—an act that was also of "particular concern" to the circuit court—WCU is attempting to protect itself from actions for which it could be liable under the original agreement.[12]   The Arbitration Clause also limits a member's ability to protect him- or herself—by allowing WCU to force arbitration—and the member's ability to protect other members—by removing the option for class action lawsuits.

---

[12] Importantly, Pruett argues that "[t]he purported new agreement also tacitly acknowledged that WCU's fee practices had violated its existing contract; the new agreement expressly added terms allowing WCU to charge the very fees that [Pruett] has alleged were improper under the then existing agreement." *See supra* note 4.

¶44 In Wisconsin, "every contract carries with it a duty of good faith and fair dealing," *Kreckel v. Walbridge Aldinger Co.*, 2006 WI App 168, ¶20, 295 Wis. 2d 649, 721 N.W.2d 508, meaning "that a party [must] perform its obligations and exercise its discretion under the contract in good faith," *Acheron Med. Supply, LLC v. Cook Med. Inc.*, 958 F.3d 637, 645 (7th Cir. 2020). As other courts have recognized, this requirement is not satisfied "when discretion is used to recapture opportunities forgone upon contracting." *See Sears*, 593 S.E.2d at 432; *Sevier*, 990 F.3d at 480-81; *Badie*, 79 Cal. Rptr. 2d at 284. Instead, we agree that "[a] party may exercise a discretionary power 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.'" *Sears*, 593 S.E.2d at 432 (citation omitted).

¶45 We conclude that WCU did not act in good faith when it attempted to add a new term to the original Agreement seeking to retroactively deprive another party of a legal right.[13] WCU's contractual authority to "change the terms of this Agreement" did not authorize it to unilaterally add the Arbitration Clause absent evidence that the Arbitration Clause was the type of change contemplated by the parties at the time of the original Agreement. For the reasons discussed above, we are not convinced that anything reasonably related to the Arbitration Clause was previously contemplated. Thus, we agree with the *Sevier* court's analysis that allowing WCU to add an uncontemplated term via the change-of-terms provision would "place the burden on the [consumers] to … object to a company's unilaterally

---

[13] WCU argues that it did not violate the duty of good faith and fair dealing because "there is no inherent duty of good faith with respect to contract formation." *See Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 596, 532 N.W.2d 456 (Ct. App. 1995). As we consider this issue with regard to the change-of-terms provision, we are not suggesting that WCU failed to act in good faith with regard to contract formation. We will address this argument no further.

adopted arbitration policy or risk being found to have agreed to it. This is not how contracts are formed." *See Sevier*, 990 F.3d at 477-78 (citation omitted). Under the facts here, we cannot "assume … that notice alone, without some affirmative evidence of [Pruett's] consent, could bind [Pruett] to a significant change regarding matters that were not addressed in the original contract at all," especially where the later-added Arbitration Clause sought to deprive Pruett of the right to a jury trial and to select a judicial forum for dispute resolution.[14] *See id.* at 479-81 (citing *Badie*, 79 Cal. Rptr. 2d at 273).

¶46 Even if we construed the Agreement's reference to the county in which legal action shall be brought to qualify as a "term" evidencing that the parties contemplated the addition set forth in the Arbitration Clause, we conclude that WCU's failure to act in good faith precludes that finding under the circumstances here. WCU's addition of the Arbitration Clause appears to have been undertaken to "'recapture' a foregone opportunity," *see Sevier*, 990 F.3d at 481 (citation omitted), and protect WCU retroactively from alleged wrongdoing. Thus, WCU was not authorized by the terms of the Agreement to unilaterally add the Arbitration Clause, and something more than silence—i.e., affirmative assent—was required to demonstrate that Pruett agreed to the new terms. *See Midwest Neurosciences Assocs.*, 384 Wis. 2d 669, ¶¶43-44 ("Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" (citation omitted)). Absent Pruett's affirmative assent, WCU failed to meet its burden to prove that an agreement to

---

[14] To the extent it could be argued that the *Sevier* court's reasoning hinged on the unavailability of an opt-out provision, as we explain further below, the opt-out provision provided by WCU was inoperable. Therefore, it does not factor into our analysis here.

arbitrate was formed under the change-of-terms provision that would cover the dispute in this case.

### III. WCU Failed to Meet its Burden to Prove that Pruett Clearly Manifested Assent to Arbitration.

¶47    Separate from the change-of-terms provision, WCU argues—presumably in the alternative—that the Arbitration Clause was a proposed contract modification that it invited its members to accept and that it provided members with the opportunity to opt out of being bound to the modified terms.  In Wisconsin, the existence of an agreement to modify a contract is "established in the same way as any other contract." *Kohlenberg v. American Plumbing Supply Co.*, 82 Wis. 2d 384, 393, 263 N.W.2d 496 (1978).  "Modification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification." *Nelsen v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 55, 90 N.W.2d 123 (1958) (citation omitted).

> While the parties to a contract may modify it by a subsequent contract which is shown by their acts, the acts which are relied upon to modify a prior contract must be unequivocal in their character.  Acts which are ambiguous in their character, and which are consistent either with the continued existence of the original contract, or with a modification thereof, are not sufficient to establish a modification.

*Id.* at 56 (citation omitted).

¶48    According to WCU, "[a]n assent or acceptance of a contract offer can be manifested by deed as well as by word." *See Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 454, 273 N.W.2d 214 (1979).  Here, WCU argues that Pruett's "silence and inaction operate as an acceptance" because "previous dealings" make it "reasonable that the offeree should notify the offeror if he [or she] does not intend

to accept." *Id.* at 457 (citation omitted); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 69 & cmt. d (AM. L. INST. 1981) ("[T]he offeree's silence is acceptance, regardless of his [or her] actual intent, unless both parties understand that no acceptance is intended."). WCU further explains that "[t]he Seventh Circuit has held contracts offered on a take-it-or-leave-it basis are valid agreements for the applicability of the" Federal Arbitration Act and that the Seventh Circuit, applying Wisconsin law, has also held that continued use of a product or service constitutes acceptance of the terms of an agreement, including an arbitration provision. *See Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 867 (E.D. Wis. 2006); *Delonge v. Time Warner Cable Bus. LLC*, No. 13-CV-0988, 2014 WL 3890766 at *2 (E.D. Wis. Aug. 6, 2014); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452 (7th Cir. 1996).

¶49 WCU claims that it "notified Pruett that to reject the offer, he had a 'duty to speak' by informing [WCU] of his intent to opt out. The Notice advised Pruett that his silence and the continued use of his account would demonstrate assent to the arbitration provision." Therefore, argues WCU, "Pruett's actions can only reasonably be construed as acceptance of the Agreement as he was given a clear offer to arbitrate, a reasonable opportunity to reject that offer, and instruction that silence and continued use of his account reflected acceptance of the terms."

¶50 It is undisputed that Pruett did not attempt to opt out of the Arbitration Clause, and he continued to use his WCU account after receiving Notice.[15] While we acknowledge that, in certain circumstances, failure to opt out of an arbitration

---

[15] There remains a dispute regarding whether Pruett received the Notice that was sent to him by mail. Pruett denies receiving it, but WCU presented evidence that the Notice was mailed to him. *See supra* note 5. For the purpose of this decision, we will assume, without deciding, that Pruett received the Notice sent to him by WCU.

provision can constitute acceptance, under the circumstance in this case, WCU's purported offer was not sufficiently clear to reasonably convey what was required of Pruett to demonstrate his assent to, or rejection of, the modified terms. We agree with Pruett and the circuit court that the deadline given by WCU to opt out of the Arbitration Clause was unclear. In particular, the Arbitration Clause, drafted by WCU, provided that Pruett could opt out of the clause by sending "written notice that you want to opt out of this provision of your [a]ccount Agreement within 60 days of account opening or within 60 days of receiving this notice, *whichever is sooner*." (Emphasis added.) It is undisputed that Pruett opened his account in 1991 and that the Notice of the Arbitration Clause was sent in 2021. Accordingly, the circuit court reasoned:

> A reasonable person would understand that 2021 is "later" than 1991, not "sooner." Thus, a person could reasonably conclude, based on the plain language chosen by WCU, that [members] had 60 days from account opening, which is the "sooner" date, to opt out. Yet doing so was impossible because when [Pruett] opened his account in 1991 the Arbitration Clause did not even exist.

The court found "that 'sooner' plainly means the earlier date."

¶51 WCU disagrees with the circuit court's interpretation, calling it "absurd" and asserting that it creates an unreasonable result, and WCU provides its own interpretation of the language. However, other courts have reached the same result as the circuit court based on similar language. *See **Duling v. Mid Am. Credit Union**, 530 P.3d 737, 749-50 (Kan. Ct. App. 2022); **Canteen**, No. 21-CVS-6056, 2021 WL 7967397 at *9-10. Thus, it is clear that the language "whichever is sooner" could reasonably be interpreted differently than argued by WCU, i.e., the language is ambiguous. *See **Tufail**, 348 Wis. 2d 631, ¶27.

30

¶52    Contrary to WCU's assertion, the language in the Notice that "[t]he Arbitration and Class Action Waiver Agreement provision is effective within 60 days of this notice … unless you opt out" does not resolve the confusion. We still must consider the documents together, and the Notice does not specifically clarify the opt-out deadlines. Therefore, WCU's proposed contract modification remains unclear, and any ambiguity must be construed against WCU as the contract's drafter. *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶44, 326 Wis. 2d 300, 786 N.W.2d 15 ("The principle that ambiguities are construed against the drafter is a 'deeply rooted doctrine' of contract interpretation." (citation omitted)).

¶53    However, we need not consider the proper interpretation of the "whichever is sooner" language in the opt-out provision. The fact that the opt-out provision was ambiguous and must therefore be construed against WCU supports our conclusion that WCU failed to demonstrate that Pruett assented to its offer to add the Arbitration Clause to its Agreement by Pruett's failure to opt out and by his continued use of his account after receiving the Notice. It is reasonable to believe Pruett may have thought it futile to opt out or that the opt-out provision did not apply to him based on one interpretation of the opt-out provision's language. As Pruett argues, we cannot presume "Pruett assented by not doing something that was impossible, i.e., by not sending in an opt out [notice] when the deadline given to do so was already in the past."

¶54    We do not suggest that WCU could never enter into an arbitration agreement with its members, but the cases on which WCU relies—*Tickanen*, *Delonge*, *ProCD, Inc.*—are all distinguishable. Here, Pruett could not opt out because the language of the opt-out provision made that impossible. Further, even if Pruett stopped using his account or closed it in an attempt to opt out, his efforts would be unsuccessful. According to the Notice and WCU, the only way for Pruett

to reject the Arbitration Clause was to opt out in writing, not close the account. Even then, Pruett would still be responsible for the alleged improper charges and fees that accrued prior to the Arbitration Clause being added to the Agreement due to the Arbitration Clause becoming effective immediately and its retroactive application.

## CONCLUSION

¶55    In conclusion, WCU has failed to meet its burden to demonstrate an agreement to arbitrate. To the extent WCU argues it was authorized to unilaterally add the Arbitration Clause to its member Agreement pursuant to the change-of-terms provision, we conclude that the Arbitration Clause was not the type of change contemplated by that provision at the time of the original contract. Accordingly, the addition of the Arbitration Clause under the change-of-terms provision—i.e., without requiring Pruett to assent—was unreasonable based on the plain language of the provision and was a violation of the duty of good faith and fair dealing. To the extent WCU argues that the Arbitration Clause was not a unilateral addition but was instead an offer to modify the contract, we conclude that WCU did not demonstrate Pruett's consent to arbitrate by his failure to opt out and by continuing to use his account. The terms of the opt-out provision were ambiguous, and Pruett's failure to opt out under the facts of this case did not constitute his assent to the amended terms. Accordingly, the Arbitration Clause is not enforceable against Pruett.

*By the Court.*—Order affirmed.