IN THE SUPREME COURT OF NORTH CAROLINA

No. 10A23

Filed 23 May 2024

LATOYA CANTEEN and PAMELA PHILLIPS

v.

CHARLOTTE METRO CREDIT UNION

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 286 N.C. App. 539 (2022), reversing an order entered on 7 September 2021 by Judge George C. Bell in Superior Court, Mecklenburg County. Heard in the Supreme Court on 21 February 2024.

> *Fox Rothschild LLP, by Troy D. Shelton, Nathan W. Wilson, Brian Bernhardt, and Vess A. Miller, for plaintiff-appellant.* [1]
>
> *Cranfill Sumner LLP, by Steven A. Bader, Mica N. Worthy, and Ryan D. Bolick, for defendant-appellee.*
>
> *Ellis & Winters LLP, by Michelle A. Liguori, James M. Weiss, and Tyler C. Jameson, for Carolinas Credit Union League, amicus curiae.*
>
> *Ward and Smith, P.A., by Christopher S. Edwards and Taylor B. Rodney, and Henson Fuerst, P.A., by Rachel A. Fuerst and C. Jordan Godwin, for North Carolina Advocates for Justice, amicus curiae.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Christopher G. Smith, for the North Carolina Chamber Legal Institute and the North Carolina Association of Defense Attorneys, amicus curiae.*

---

[1] After oral arguments, the firm of Fox Rothschild LLP and attorneys Brian C. Bernhardt and Nathan W. Wilson, withdrew as counsel for plaintiff-appellant. Troy D. Shelton, along with Vess A. Miller of Cohen & Malad, LLP remain as counsel for plaintiff-appellant.

*Joshua H. Stein, Attorney General, by Nicholas S. Brod, Deputy Solicitor General, Ryan Y. Park, Solicitor General, and Daniel P. Mostellar, Deputy General Counsel, for the State of North Carolina, amicus curiae.*

BERGER, Justice.

This case involves a contract between two parties that allowed for the unilateral change of contractual terms by one party upon notice to the other. Based upon the dissenting opinion below, the question before this Court is whether defendant's modification of the contract to include an arbitration amendment complies with the implied covenant of good faith and fair dealing and the rule against illusory contracts. We conclude that it does, and as such the modification is enforceable.

## I. Factual and Procedural Background

In 2014, plaintiff Pamela Phillips[2] opened a checking account with defendant Charlotte Metro Credit Union. Phillips and the Credit Union entered into a standard membership agreement. Included in the terms of the contract was a "Notice of Amendments" provision and a "Governing Law" provision.

The Notice of Amendments provision provided:

> Except as prohibited by applicable law, [defendant] may change the terms of this Agreement. We will notify you of any change in the terms, rates, or fees as required by law. We reserve the right to waive any term in this Agreement. Any such waiver shall not affect our right to future

---

[2] Latoya Canteen is a party to the underlying class action. However, the Credit Union's Motion to Stay Action and Compel Arbitration only challenged Phillips's right to join the class action without arbitration, and as such, Canteen is not a party to the current appeal.

enforcement.

The Governing Law provision stated:

> This Agreement is governed by the credit union's bylaws, federal laws and regulations, the laws, including applicable principles of contract law, and regulations of the state in which the credit union's main office is located, and local clearinghouse rules, as amended from time to time. As permitted by applicable law, you agree that any legal action regarding this Agreement shall be brought in the county in which the credit union is located.

Phillips agreed to the terms of the membership agreement and opted to receive electronic statements and communications from the Credit Union including membership disclosures.

In 2020, a separate class action was filed alleging that the Credit Union was charging overdraft fees on accounts which had not been overdrawn. Phillips was not a party to this litigation. In January 2021, the Credit Union amended its membership agreement with all members to require arbitration for certain disputes and to waive their right to file class actions. (Arbitration Amendment). In compliance with the Notice of Amendments provision and Phillips's selected form of notice, the Credit Union emailed Phillips with notice of the Arbitration Amendment on 5 January 2021, 2 February 2021, and once again on 2 March 2021.

The 5 January 2021 email was titled "Charlotte Metro CU Online Statement and Changes to Membership and Account Agreements are Available." The body of the email included a section concerning "Additional Forms and Notices." This section contained underlined and hyperlinked phrases, including "Information about

Arbitration," "Arbitration and Class Action Waiver," and "Membership and Account Agreement Change in Terms." The "Information about Arbitration" hyperlink led to a letter authored by the Credit Union's chief administrative officer and general counsel, which informed all Credit Union members:

> [The] Arbitration and Class Action Waiver provision will become effective on February 1, 2021. You do have until February 10, 2021 to exercise your right to opt-out of this provision (instructions on how to opt-out are included in the attached provision). However, if you don't opt out of this provision, then your continued use or maintenance of your Charlotte Metro account will act as your consent to this new provision.

Attached to the letter was the Arbitration Amendment at issue in this case.

The text of the Arbitration Amendment likewise notified members of their right to opt-out. The Arbitration Amendment's timeline for opting out stated that Phillips, like all members, "ha[d] the right to opt out of this agreement to arbitrate if you tell us within 30 days of the opening of your account or the mailing of this notice, whichever is sooner." Phillips did not opt out within the 30-day window.

On 25 March 2021, Phillips filed a class action complaint in the Superior Court, Mecklenburg County against the Credit Union for the collection of overdraft fees on accounts that were never overdrawn. In response, the Credit Union filed a motion to stay the action and to compel arbitration, stating that because "Phillips received and did not opt-out of the Mandatory Arbitration and Class Action Waiver requirements," arbitration was required.

The trial court denied the Credit Union's motion to stay and compel

arbitration. The trial court concluded as a matter of law that, "the 'Notice of Amendments' provision here, by its plain language, did not permit CMCU to unilaterally 'add' a wholly new arbitration provision and then claim that Plaintiff's silence or inaction in the face of the unauthorized addition shows Plaintiff's assent." The trial court further held that "[e]ven if CMCU had the ability to 'add' new provisions . . . that ability was restricted by the duty of good faith and fair dealing." The Credit Union appealed this interlocutory order to the Court of Appeals.

The Court of Appeals reversed the trial court's determination and remanded the case to the trial court to stay the action pending arbitration. *Canteen v. Charlotte Metro Credit Union*, 286 N.C App. 539, 544 (2022). The Court of Appeals held that the Arbitration Amendment was an enforceable amendment to the original contract. *Id.* at 542. However, the dissent contended that there was no binding arbitration agreement between Phillips and the Credit Union, arguing that this change violated the implied covenant of good faith and fair dealing and rendered the contract illusory. *Id.* at 545 (Arrowood, J., dissenting). We affirm the Court of Appeals.

## II. Analysis

In North Carolina there is a "strong public policy favoring the settlement of disputes by arbitration." *Johnston Cnty. v. R.N. Rouse & Co.*, 331 N.C. 88, 91 (1992); *see also Cyclone Roofing Co. v. David M. LaFave Co.*, 312 N.C. 224, 229 (1984). In fact, "any doubt concerning the existence of such an agreement must . . . be resolved in favor of arbitration." *R.N. Rouse & Co.*, 331 N.C. at 92. But despite this favorable

view, "submission to arbitration is a contract" and as such must meet the demands of contract law. *Charlotte City Coach Lines, Inc. v. Brotherhood of R.R. Trainmen*, 254 N.C. 60, 67 (1961). The party seeking to compel arbitration has the burden to "show that the parties mutually agreed to arbitrate their disputes." *T.M.C.S., Inc. v. Marco Contractors, Inc.*, 244 N.C. App. 330, 339 (2015). A trial court's determination of whether a dispute is subject to arbitration is a conclusion of law reviewed de novo. *Id.*

We begin with the threshold question of whether the Arbitration Amendment is a valid and enforceable contract between the parties. There is no dispute that Phillips and the Credit Union entered into a valid contract in 2014.[3] The membership agreement included a "Notice of Amendments" provision which reserved the right for the Credit Union to "change the terms of th[e] agreement" upon notice to Phillips. However, this Court has not addressed the boundaries of a party's ability to include a change-of-terms provision and then unilaterally amend a contract pursuant to that provision. We take this opportunity to do so.

Common law principles dictate that traditionally, any "alter[ation] [of] the terms of a contract must be supported by new consideration," *Wheeler v. Wheeler*, 299 N.C. 633, 637 (1980), and that parties to an agreement must consent to a modification of the terms of said agreement. *Rowe v. Rowe*, 305 N.C. 177, 183 (1982).

---

[3] Phillips concedes that the 2014 contract was valid and enforceable yet argues the "Notice of Amendments" provision would render the contract illusory.

However, "[w]ritten contracts are to be construed and enforced according to their terms." *Galloway v. Snell*, 384 N.C. 285, 287 (2023) (cleaned up). Because "parties ha[ve] the legal right to make their own contract[s]," when the parties' intent is "clearly expressed, it must be enforced *as it is written*." *Home Owners' Loan Corp. v. Ford*, 212 N.C. 324, 326–27 (1937) (emphasis added) (quoting *Am. Potato Co. v. Jenette Bros. Co.*, 172 N.C. 1 (1916)); *see also Galloway*, 384 N.C. at 288 (stating that contracts must be interpreted in a way "to give every word and every provision effect" (cleaned up)). Further, this Court has long held that "the law will not relieve one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing." *Leonard v. So. Power Co.*, 155 N.C. 10, 11 (1911).

Thus, when parties have mutually agreed to a unilateral change-of-terms provision, said provision "must be enforced as it is written," *Home Owners' Loan Corp.*, 212 N.C. at 327, subject to certain limitations. Contrary to plaintiff's assertions, the traditional modification analysis which requires mutual assent and consideration does not apply to changes stemming from a valid unilateral change-of-terms provision in an existing contract.[4]

Nonetheless, a change-of-terms provision does not grant a party free rein to alter a valid agreement; a party seeking to implement a change pursuant to a change-

---

[4] If a party's amendment falls outside the "universe of terms" of the original agreement, it is no longer a permissible unilateral amendment and thus must comply with the traditional modification elements of offer, acceptance, and consideration.

of-terms clause must comply with the implied covenant of good faith and fair dealing. Because this Court has not yet addressed the legal framework surrounding the limitations on change-of-terms provisions, we turn to other jurisdictions and to our Court of Appeals for persuasive guidance. While these decisions are not binding on this Court, "we borrow freely from these cases to the extent we find their reasoning to be persuasive and applicable." *See Reynolds Am. Inc. v. Third Motor Equities Master Fund Ltd.*, 379 N.C. 524, 528 (2021).

## A.  Implied Covenant of Good Faith and Fair Dealing

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985) (cleaned up). Thus, in this context, when a party makes unilateral changes to the terms of a contract pursuant to a change-of-terms clause which modify the original "benefits of the agreement," the implied covenant of good faith and fair dealing *may* be implicated. *Id.*; *see Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 268 (2023) (in applying Delaware law, this Court held that the implied covenant of good faith and fair dealing is limited to situations where contractual gaps exist that "neither party anticipated" and for which the complaining party could not have contracted around.)

In *Badie v. Bank of Am.*, the California Court of Appeal addressed the tension between the implied covenant of good faith and fair dealing and unilateral changes

to a contract, 79 Cal. Rptr. 2d 273 (Cal. Ct. App. 1998). At issue in *Badie* was an arbitration amendment which was unilaterally added by a party pursuant to a change-of-terms provision. *Id.* at 276–77.

The *Badie* court held that to comply with the covenant of good faith and fair dealing, changes to a contract must relate to "the universe of terms included in the original agreement." *Id.* at 285. Changes fall within the same "universe of terms" if they relate to the "general subject matter [which] was anticipated when the contract was entered into," *id.* at 281, and thus were "within the reasonable contemplation of the parties at the time of contract formation." *Id.* at 284 (cleaned up). Ultimately, the court held that because the original contract "did not include any provision regarding the method or forum for resolving disputes," the arbitration amendment did not relate back to the universe of terms of the original agreement, and therefore violated the covenant of good faith and fair dealing. *Id.* at 283–84.

*Badie* has been relied on by other jurisdictions as the framework for addressing this same issue. *See Decker v. Star Fin. Grp., Inc.*, 204 N.E.3d 918, 921–22 (Ind. 2023); *Kortum-Managhan v. Herbergers NBGL*, 204 P.3d 693, 698 (Mont. 2009); *Pruett v. WESTconsin Credit Union*, 998 N.W.2d 529, 545–46 (Wis. Ct. App. 2023).

Our Court of Appeals also adopted this approach twenty years ago in *Sears Roebuck and Co. v. Avery*, 163 N.C. App. 207 (2004). In *Sears*, our Court of Appeals, applying Arizona law, was tasked with determining whether a bank was permitted to unilaterally amend a consumer contract to include an arbitration provision. *Id.* at

212. The contract at issue in that case, as the one *sub judice*, contained a provision which permitted Sears to "change any term or part of th[e] agreement" upon written notice to the customer. *Id.* at 208.

Relying on *Badie*, the Court of Appeals concluded that parties can only rely on change-of-terms provisions "insofar as the new or modified terms relate to subjects already addressed in some fashion in the original agreement." *Id.* at 220. The Court of Appeals emphasized that changes which relate back to the "universe of terms" of the original agreement are consistent with the covenant of good faith because they relate to subjects "within the reasonable contemplation of the parties at the time of [contract] formation." *Id.* at 218 (cleaned up). Based on this reasoning, the Court of Appeals concluded that because the original agreement "made no reference to arbitration or any other dispute resolution procedures and did not in any manner address the forum in which a customer could have disputes resolved," *id.* at 208, the arbitration clause "did not fall within the universe of subjects included in the original agreement," and thus violated the covenant of good faith and fair dealing, *id.* at 222.

These cases suggest that if the original agreement includes any provisions relating to forums or methods for dispute resolution, then a modification to include an arbitration agreement is within the same universe of terms and therefore permissible under a change-of-terms provisions. *See Sears Roebuck and Co.*, 163 N.C. App. at 220; *Badie*, 79 Cal. Rptr. 2d at 284. This conclusion is further supported by the Supreme Court's holding that "[a]n agreement to arbitrate before a specified

tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).

We find this analytical framework persuasive. Given the nature of the modern economy[5], change-of-terms provisions are a necessary and efficient way for companies to update contractual provisions without canceling accounts and renegotiating contractual terms every time modification may be required.[6] At the same time, the

---

[5] Our dissenting colleague ignores fundamental economic realities of the market. While lay consumers may not understand every legal intricacy involved in the contractual process with companies, the market provides a way for consumers to respond to policies with which they disagree. As needs arise, competitor companies can provide alternatives for consumers, forcing improvements or updates to products or services, including terms to satisfy consumers' desires. *See NSA Scandal Delivers Record Numbers of Internet Users to DuckDuckGo*, The Guardian, (July 10, 2013), https://www.theguardian.com/world/2013/jul/10/nsa-duckduckgo-gabriel-weinberg-prism (last visited May 16, 2024) (Noting that within days of the NSA claiming "direct access to the servers of companies including . . . Google, Microsoft and Yahoo," the "zero tracking" website received "50% more traffic than ever before.").

[6] Based on our dissenting colleague's analysis, which again ignores market realities, it appears that every user contract between consumers and major companies such as Apple, Facebook, and Amazon are illusory because they contain change-of-terms provisions alongside governing law and/or arbitration agreements. *See Terms and Conditions*, APPLE PAYMENTS INC., https://www.apple.com/legal/applepayments/direct-payments/ (last visited May 16, 2024) (Requiring arbitration, while also reserving the right to "modify, suspend, or discontinue the Direct Payments Service and/or revise these . . . terms from time to time in [Apple's] sole discretion without prior notice or liability"); *Conditions of Use*, AMAZON, https://www.amazon.com/gp/help/customer/display.html?nodeId=GLSBYFE9MGKKQXXM (last visited May 16, 2024) (Containing a "Disputes" resolution provision, while also reserving the right "to make changes to [the] . . . Service Terms, and these Conditions of Use at any time"); *Terms of Service*, FACEBOOK, https://m.facebook.com/legal/terms (last visited May 16, 2024) (Requiring dispute resolution in U.S. District Court for the Northern District of California, but also reserving the right to "update these Terms from time to time" and binding the user if they "continue to use [the] Products."). How would my dissenting colleague propose products and services be efficiently delivered if, under such a limited view of the modern market, consumer contracts had to be canceled and renegotiated with every necessary update, some of which benefit consumers?

implied covenant of good faith and fair dealing ensures that change-of-terms provisions do not provide carte blanche to parties seeking to modify agreements, as the changes must relate to the same universe of terms as the original agreement. Thus, we conclude that modifications made pursuant to change-of-terms provisions comply with the covenant of good faith and fair dealing if the changes reasonably relate to subjects discussed and reasonably anticipated in the original agreement.

Therefore, the remaining question is whether the membership agreement contained terms related to dispute resolution such that a reasonable person could have anticipated the inclusion of an arbitration clause. We conclude that it did.

Here, the contract between Phillips and the Credit Union contained a "Governing Law" provision. This provision stated that the contract was subject to the laws of North Carolina, and that both parties agreed to bring any legal action regarding the contract "in the county in which the credit union is located." Based on these terms, the Governing Law provision clearly contemplated the forum and method for dispute resolution between the parties. Because the Arbitration Amendment simply changed the forum in which the parties could raise certain disputes, *see Sherck*, 417 U.S. at 519, we find that it was within the same universe of terms as the Governing Law provision. Therefore, contrary to Phillips's contention, the Arbitration Amendment did not violate the implied covenant of good faith and fair dealing.

**B. Illusoriness**

Phillips next contends that permitting the unilateral Arbitration Amendment pursuant to the Notice of Amendments provision would render the contract illusory. We disagree.

A contract is illusory when the promisor "reserve[s] an unlimited right to determine the nature or extent of his performance." *State v. Phillip Morris USA, Inc.*, 363 N.C. 623, 641–42 (2009) (cleaned up). However, as acknowledged by our Court of Appeals in *Sears*, "an otherwise illusory contract may be remedied because a limitation on a promisor's freedom of choice 'may be supplied by law.'" *Sears Roebuck and Co.*, 163 N.C. App. at 220 (citing Restatement (Second) of Contracts 2d § 77 cmt. d (1981)); *see also 24 Hour Fitness, Inc. v. Superior Court*, 78 Cal. Rptr. 2d 533, 541–42 (Cal. App. 1998) (Because the party's "discretionary power to modify the terms of the [contract] in writing indisputably carries with it the duty to exercise that right fairly and in good faith . . . . the modification provision does not render the contract illusory."); *Bassett v. Elec. Arts, Inc.*, 93 F.Supp.3d 95, 106 (E.D.N.Y. 2015) ("[T]he arbitration provision was not invalid as illusory simply because [the party] had the unilateral right to modify the agreement . . . as the discretionary power to modify or terminate an agreement carries with it the duty to exercise that power in good faith and fairly.") .

Here, the Notice of Amendments provision explicitly limited its scope by stating "[e]xcept as prohibited by applicable law." As discussed above, the implied covenant of good faith and fair dealing requires that any modifications made

pursuant to a change-of-terms provision fall within the universe of terms included in the original agreement. This requirement serves as a sufficient "limitation on a promisor's freedom of choice" and as such remedies any purported issues of illusoriness which may arise from a change-of-terms clause.[7]

## C. Mutual Assent

Finally, Phillips asserts that she "did not accept the Credit Union's offer to arbitrate through silence" and therefore, the Arbitration Amendment is not an enforceable agreement between the parties. Phillips argues that if it is found to be binding without her mutual assent, then this logic would also permit "[t]he Credit Union's members [to] send letters to the Credit Union stating that, unless the Credit Union expressly opts out, the Credit Union is bound to deposit an extra $1,000 in their accounts each month." However, this argument is wholly misguided and neglects to address the fact that Phillips consented to a change-of-terms provision which permitted the Credit Union to amend terms upon notice, and the membership agreement did not contain a provision which permitted Phillips to do the same.

---

[7] Our dissenting colleague dedicates more than two pages of her opinion to case law which she concedes is distinguishable on several grounds. First and foremost, out of the fifteen cases cited, only one relates to a consumer contract containing a unilateral change-of-terms provision which is later amended to include an arbitration provision. *See Pruett*, 998 N.W.2d at 539–44 (Adopting the same *Badie* and *Sears* framework as this opinion but concluding that the arbitration amendment was an addition rather than a permissible change). Also, all but four of these cases concern employment contracts which initially contained arbitration agreements, but which the employer retained significant authority to retroactively alter, amend, retract, or delete either the arbitration provision itself, or the rules for the arbitration proceedings. Given the distinct factual differences of these cases, they are inapposite to our conclusion today.

The Notice of Amendments provision at issue demonstrated an agreement between Phillips and the Credit Union that the Credit Union was free to change the terms upon notice to Phillips—not consent by Phillips. Therefore, contrary to Phillips's argument, this was not an "offer" which required mutual assent.[8] Any mutual assent which was required was given in 2014 when Phillips agreed to be bound by the Notice of Amendments provision.

## III. Conclusion

Change-of-terms provisions permit unilateral amendments to a contract so long as the changes reasonably relate back to the universe of terms discussed and anticipated in the original contract. Here, the Arbitration Amendment was within the universe of terms of the contract between the parties, and thus complies with the implied covenant of good faith and fair dealing and does not render the contract illusory. As such, we affirm the Court of Appeals' determination that the Arbitration Amendment is a binding and enforceable agreement between Phillips and the Credit Union.

AFFIRMED.

---

[8] We note that while both parties categorize the Arbitration Amendment as a unilateral modification, and we analyze as such, one could argue that the opt-out provision acts as an offer to modify, which in turn requires acceptance by the other party. *See Snyder v. Freeman*, 300 N.C. 204, 218 (1980). However, because the Court of Appeals' dissent did not raise this argument, we do not address it. *See Cryan v. Nat'l Council of Young Men's Christian Assn's of U.S.*, 384 N.C. 569, 574–575 (2023). Nonetheless, we note that even under that theory, Phillips's failure to opt out of the modification here would likely still be fatal to her claim.

Justice DIETZ did not participate in the consideration or decision of this case.

Justice RIGGS dissenting.

Today's decision upends what should be a level playing field between ordinary customers and commercial entities. It hurts consumers, unfairly favors sophisticated corporations, and abandons the scrutinous approach generally taken to agreements of adhesion like form consumer contracts. Charlotte Metro Credit Union (CMCU), while facing a class action lawsuit related to the alleged assessment of unlawful fees against its customers, unilaterally imposed new terms on its membership agreement with Pamela Phillips in an apparent attempt to retroactively insulate itself from the full consequences of those allegedly unlawful acts. Relying on a materially unrestrained modification provision in a consumer contract, CMCU single-handedly deprived Ms. Phillips of her constitutional right to a jury trial on her claims *and* the ability to defray the burden of vindicating that right through a class action. To make matters worse, the modification's language—drafted and adopted by CMCU alone— left Ms. Phillips without an avenue to opt out of arbitration and the class action waiver.

I would hold that these actions by CMCU violate North Carolina contract law. These unilaterally adopted provisions are illusory—nothing precludes CMCU under the majority's opinion from one-sidedly restoring CMCU's rights to bring its claims in court. CMCU's arbitration amendment also violated the implied covenant of good faith and fair dealing, which precludes parties from single-handedly "recaptur[ing]

-17-

opportunities forgone upon contracting." Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 373 (1980). Finally, the majority's holding is at odds with the realities of consumer contracts and the effects of arbitration on the constitutional right to trial by jury, both generally and in this particular case. For these reasons, I respectfully dissent.

## I.     Analysis

My disagreement begins with the recognition of a fundamental principle of contract law: an illusory contract, which "confers upon [a party] an unlimited right to determine the nature or extent of his performance," *Wellington-Sears & Co. v. Dize Awning & Tent Co.*, 196 N.C. 748, 752 (1929), is no contract at all. *See, e.g., Kirby v. Stokes Cnty. Bd. of Educ.*, 230 N.C. 619, 626 (1949) ("One of the essential elements of every contract is mutuality of agreement. And mutuality of promises means that the promises, to be enforceable, must each impose a legal liability upon the promisor. Each promise then becomes a consideration for the other." (cleaned up)).

The unilateral modification provision in this case—allowing CMCU to modify any provisions at will and waive[1] contract terms in its sole discretion—renders the terms of the arbitration and class action waiver amendment illusory. The majority simultaneously holds that: (1) Ms. Phillips contracted away all essential elements for modification, i.e., offer, assent, and new consideration, *Wheeler v. Wheeler*, 299 N.C.

---

[1] In addition to allowing unilateral changes, the amendment clause also authorized CMCU to "waive any term in this Agreement" and added that "[a]ny such waiver shall not affect our right to future enforcement."

633, 637 (1980); (2) the arbitration amendment was a "change" to existing terms—rather than an addition of new terms—because the underlying contract contained a forum selection clause; and (3) retroactively and prospectively restricting claims to arbitration satisfied the implied covenant of good faith and fair dealing because such action "fall[s] within the universe of terms included in the original agreement . . . [which] remedies any purported issues of illusoriness which may arise from a change-of-terms clause." If this is so, CMCU remains free to single-handedly unbind itself from arbitrating anything at all.

Under the rule from the majority opinion, CMCU could promulgate an amendment today eliminating any obligation to arbitrate *its* claims while leaving the requirement that Ms. Phillips arbitrate *hers* intact. Such an act would not offend the logic of the majority's holding; having diminished the covenant of good faith and fair dealing to merely requiring that the unilateral amendment "reasonably relate to subjects discussed and reasonably anticipated in the original agreement," and with no requirements for assent or new consideration, such an amendment is perfectly consistent with the majority's position. On a whim, CMCU could effortlessly free itself from arbitration while leaving Ms. Phillips helplessly bound.

And yet, cases from other jurisdictions rejecting this logic are strewn throughout the pages of those jurisdictions' case law. *See, e.g., Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938–39 (4th Cir. 1999) (affirming a trial court's determination that an arbitration agreement supplemental to an employment contract was illusory

partly because the employer could unilaterally change or eliminate arbitration); *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 292–93 (4th Cir. 2022) (holding an arbitration provision subject to a unilateral modification clause allowing one party to "change, abolish, or modify existing policies, procedures or benefits . . . as it may deem necessary with or without notice" was illusory); *Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008) (holding an arbitration amendment inserted into multi-level marketing distribution agreements were illusory because "nothing . . . precludes amendment to the arbitration program—made under Amway's unilateral authority to amend its Rules of Conduct—from eliminating the entire arbitration program or its applicability to certain claims or disputes"); *Torres v. S.G.E. Mgmt., L.L.C.*, 397 F. App'x 63, 68 (5th Cir. 2010) (holding arbitration promise in a multi-level marketing contract was illusory when the promisor "essentially could renege on its promise to arbitrate by merely posting an amendment to the agreement on its website"); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206 (5th Cir. 2012) (holding an employment contract's arbitration clause was illusory under Texas law where another provision of the contract allowed the employer to unilaterally modify all provisions of the agreement and did not contain a savings clause); *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 315–16 (6th Cir. 2000) (holding an arbitration agreement illusory because it allowed one party "to alter the applicable rules and procedures without any obligation to notify, much less receive consent from [the other party]"); *Penn v. Ryan's Fam. Steak Houses, Inc.*, 269 F.3d

753, 759–60 (7th Cir. 2001) (holding an arbitration agreement was illusory when it gave one party "the sole, unilateral discretion to modify or amend" the arbitration provisions); *Dumais v. Am. Golf. Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." (citations omitted)); *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 126 (D.Me. 2012) ("[B]ecause Phoenix retained the unfettered right to amend the terms of the arbitration agreement with its employees, the arbitration agreement was illusory and unenforceable."); *In re Zappos.com, Inc. Customer Data Sec. Breach Litigation*, 893 F. Supp. 2d 1058, 1066 (D.Nev. 2012) ("In effect, the agreement allows Zappos to hold its customers and users to the promise to arbitrate while reserving its own escape hatch. . . . Because the Terms of Use binds consumers to arbitration while leaving Zappos free to litigate or arbitrate wherever it sees fit, there exists no mutuality of obligation."); *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 835 A.2d 656, 662 (Md. Ct. App. 2003) ("[T]he fact that United HealthCare reserves the right to alter, amend, modify, or revoke the Arbitration Policy at its sole and absolute discretion at any time with or without notice creates no real promise and, therefore, insufficient consideration to support an enforceable agreement to arbitrate." (cleaned up)); *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776–77 (Mo. 2014) (en banc) (holding arbitration agreement was illusory notwithstanding a thirty-day notice provision where one party "retain[ed] unilateral authority to amend the agreement retroactively"); *Peleg*

*v. Neiman Marcus Grp.*, 140 Cal. Rptr. 3d 38, 58 (Cal. Ct. App. 2012) (holding a retroactive arbitration amendment pursuant to an unlimited unilateral amendment clause in the underlying contract was illusory because "one party can avoid its promise to arbitrate by amending the provision or terminating it altogether" (cleaned up)); *Pruett v. WESTconsin Credit Union*, 998 N.W.2d 529, 544–45 (Wis. Ct. App. 2023) (holding, based in part on the discussion of illusoriness by the Court of Appeals' dissent in this case, that a credit union could not unilaterally add an arbitration clause to its services agreement notwithstanding the fact that the original agreement required "any legal action . . . be brought in the county in which the credit union is located"); *cf. Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1091 (8th Cir. 2021) (holding an arbitration provision was not illusory where any modification required separate "acknowledgment and agreement" of that modification through an unconditioned duty to notice the change and the customer's continued use following said notice).[2]

To be sure, many of the above cases do not address amendments to agreements

---

[2] Several of these cases make mention of notice. I do not believe the notice contemplated by the contract here meaningfully alters the equation. *See Peleg*, 140 Cal. Rptr. 3d at 58–59 (detailing how notice requirements do not save an illusory arbitration provision). Notably, the notice provision in this case is qualified by "as required by law" language, disclosing that notice is not always—or even often—required. *See, e.g., Bailey v. Mercury Fin., LLC*, ___ F. Supp. 3d ___, 2023 WL 6244591, *6–7 (D.Md. 2023) (holding a unilateral arbitration amendment to be illusory notwithstanding a notice provision because this "as is required by law" language did not impose any meaningful restriction on a party's ability to unilaterally revoke arbitration).

that contained forum selection clauses.[3]  But the irrelevance of that fact is self-evident: if *original* agreements containing arbitration clauses are illusory by virtue of unrestricted unilateral amendment clauses, *see, e.g., Coady*, 32 F.4th at 293, then what does a pre-existing forum selection clause matter to a subsequent *amendment* unilaterally imposing arbitration?  Whether the amendment is foreseeable or not, one party retains complete control over which and what claims are arbitrated—and the implied covenant described by the majority does nothing to restrict a one-sided abuse of that right.[4]

The implied covenant of good faith and fair dealing also carries with it more duties than the majority recognizes.  Setting aside the issue of a party's ability to freely unbind itself from arbitration, numerous authorities have also held that the unilateral imposition of a *retroactive* arbitration clause violates this covenant.  *See, e.g., Sears Roebuck & Co. v. Avery*, 163 N.C. App. 207, 219 (2004) ("A customer would not expect that a major corporation could choose to disregard potential contractual opportunities and then later, if it changed its mind, impose them on the customer

---

[3] That many of these cases do not involve amendments to consumer contracts is not the meaningful distinction the majority believes it to be.  Form consumer contracts are, if anything, *more* adhesive than traditional contracts.

[4] The majority cites to *24 Hour Fitness, Inc. v. Superior Court*, 78 Cal. Rptr. 2d 533 (Cal. Ct. App. 1998), for the proposition that the implied covenant acts as an adequate constraint on future modifications to arbitration amendments.  That case is illustrative of the hole in the majority's logic.  As *Peleg* later observed, *24 Hour Fitness* did not "precisely define[ ] the limitations that the covenant of good faith and fair dealing places on an employer's unilateral right to modify an arbitration agreement," 140 Cal. Rptr. 3d at 67.  That court then held that *the protection against retroactive modifications* contained in the implied covenant is what protected the *24 Hour Fitness* arbitration amendment from illusoriness.  *Id.*

unilaterally."); *Peleg*, 140 Cal. Rptr. 3d at 59-62; *Carey*, 669 F.3d at 206; *Pruett*, 998 N.W.2d at 639; *Sevier Cnty. Schs. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 481 (6th Cir. 2021); *Avery v. Integrated Healthcare Holdings, Inc.*, 159 Cal. Rptr. 3d 444, 454 (Cal. Ct. App. 2013); *cf. Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1195 (D.N.M. 2018) (holding an arbitration amendment was not "unreasonably one-sided" because it "d[id] not purport to render modifications retroactively applicable"). Bolstering the conclusion reached by these courts is the skeptical eye taken by this Court and others toward adhesion contracts. *See Tillman v. Com. Credit Loans, Inc.*, 362 N.C. 93, 103 (2008) (concluding that an arbitration agreement in an unnegotiated adhesion contract was procedurally unconscionable where, among other things, "the bargaining power between defendants and plaintiffs was unquestionably unequal in that plaintiffs are relatively unsophisticated consumers contracting with corporate defendants who drafted the arbitration clause and included it as boilerplate language in all of their loan agreements"); *see also Powertel, Inc v. Bexley*, 743 So.2d 570, 574 (Fl. Dist. Ct. App. 1999) (declining to enforce and apply a retroactive arbitration provision to ongoing litigation in part because "the arbitration clause [was] an adhesion contract"). Indeed, even the current draft of the Restatement of the Law of Consumer Contracts—itself a document designed to facilitate such agreements—acknowledges that "a modification clause that grants the business wide discretion to modify the terms of the contract is unenforceable by the business if the business attempts to modify the contract with

retroactive effect or otherwise in the absence of good faith," Restatement of Consumer Contracts § 5 cmt. 5. (Am. L. Inst., Rev. Tentative Draft No. 2, 2022).

On the subject of consumer contracts specifically, the majority grounds itself in practical concerns like "the nature of the modern economy," yet fails to fully recognize the realities existing on both sides of the contractual arrangement. As the majority acknowledges, consumer contracts are designed *not* to be negotiated, and they purposefully and explicitly target ordinary lay *consumers*. But a reliable economy that supports meaningful consumer engagement (and maximal consumer spending) must accommodate consumer-oriented actualities, rather than only examining interactions from the business-side perspective. The majority misses this mark: while some, not all, lawyers may realize that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute," *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974), the reality is that most ordinary lay consumers are neither aware of this legal precept nor in a position to understand its import.[5] *See, e.g.,* Jeff Sovern et al., *"Whimsy Little Contracts" with*

---

[5] It is reasonable to assume the vast majority of lay people do not hire an attorney to review the terms of consumer contracts prior to entering into them; requiring customers to do so would itself drastically alter the economics of these arrangements and likewise upend the "modern economy." In this particular case, the contract and other disclosures provided by CMCU to Ms. Phillips did not encourage her to seek advice of counsel prior to execution so that she might have understood the significance of the forum selection clause that CMCU and the majority now place upon that clause.

Though the majority claims lay consumers may look for alternative service providers to avoid "policies with which they disagree," this ignores the obvious and fails, yet again, to

*Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 1, 62 (2015) ("Our research suggests that typical consumers do not realize when they have agreed to arbitrate and do not understand the consequences of agreeing to arbitrate. While that finding may be unsurprising on its face, the depth of consumer misunderstanding did surprise us. Even those respondents who claimed to read and understand the contract got the most basic questions about the nature and effect of the arbitration clause wrong."). An arbitration amendment *and* class action waiver is not foreseeable, in any practical sense, to an ordinary consumer simply because of the existence of a forum selection clause in the underlying contract.[6] The majority thus represents a one-sided view of consumer contracts—the view that is antagonistic to consumer protection—that contradicts both the factual circumstances accompanying most consumer contracts and three basic premises of contract law: (1) a binding arbitration agreement requires mutual assent and a meeting of the minds, *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 271–72 (1992); (2) waiver of the right to trial by jury "must be examined

---

consider the consumer's position in these transactions: if people do not generally understand what arbitration is or what arbitration provisions do, then how can they know whether they agree or disagree with them?

[6] I stress that the amendment in this case did more than simply change the tribunal in which claims may be brought; it also removed a mechanism for enforcing those claims. It is one thing to suggest that Ms. Phillips should have foreseen a potential shift in the available judicial bodies based on the forum selection clause, but it is a further leap to say she should have also expected to lose her right to bring claims via class action *regardless of forum*. And while the contract at issue did contain a severability clause, the plain text of the arbitration and class action waiver amendment show them to be inseparable: "ARBITRATION REPLACES . . . THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING."

cautiously," *King v. Bryant*, 225 N.C. App. 340, 349 (2013); and (3) adhesion contracts should be *more* carefully scrutinized than negotiated arms-length transactions, *Tillman*, 362 N.C. at 103.

These practical implications are heightened by the particular facts of this case and the constitutional rights at issue. As we have previously observed:

> [S]ince the right of trial by jury is highly favored, . . . waivers of the right are always strictly construed and are not to be lightly inferred or extended by implication, whether with respect to a civil or criminal case. . . . *[I]n the absence of an express agreement or consent*, a waiver of the right to a jury trial will not be presumed or inferred. Indeed, every reasonable presumption should be made *against* its waiver.

*In re Gilliland*, 248 N.C. 517, 522 (1958) (cleaned up) (emphases added).

Here, the trial court found that the arbitration provision was inserted by CMCU without Ms. Phillips' actual assent, knowledge, or notice. The email sent in this case—though including the subject line "Changes to Membership and Account Agreements are Available" and links to "Information about Arbitration" and an "Arbitration and Class Action Waiver"—did not disclose on its face that Ms. Phillips was waiving her right to a jury trial *unless* she took action to stop it. Indeed, the links explaining the arbitration amendment were *separate* from the link explaining the "Membership and Account Agreement Change in Terms," suggesting to any reasonable reader that the "Arbitration and Class Action Waiver" was not a self-executing change to the underlying contract but instead something Ms. Phillips could elect to pursue. And even if she did follow the links and read the arbitration and

class action waiver amendment, the opt-out provision of the amendment—by its plain language—did not clearly and unambiguously apply to her: it allowed customers "to opt out of this agreement to arbitrate if you tell us within 30 days of the opening of your account or the mailing of this notice, whichever is sooner." In Ms. Phillips' case, the "sooner" of these events was thirty days within the opening of her account *seven years earlier in 2014.* Ms. Phillips also could not obviously opt out by cancelling her account; even though the accompanying letter from CMCU's chief administrative officer and general counsel indirectly suggested such a possibility by stating that continued use of the account constituted assent, the amendment itself provided that it applied "regardless of whether [ ] your account is closed."

The lack of clarity in these opt-out provisions further weighs heavily against validating the arbitration and class action waiver amendment. *See Pruett*, 998 N.W.2d at 548 ("The fact that the opt-out provision was ambiguous and must therefore be construed against WCU supports our conclusion that WCU failed to demonstrate that Pruett assented to its offer to add the Arbitration Clause . . . ."); *Duling v. Mid. Am. Credit Union*, 530 P.3d 737, 750 (Kan. Ct. App. 2022) ("Construing the [ambiguous] opt-out provisions against MACU, we find that MACU failed to show Duling assented to its offer to add an arbitration clause."). Construing these facts *against* waiver of a constitutional right as required by law, *In re Gilliland*, 248 N.C. at 522, Ms. Phillips cannot be said to have knowingly, intelligently, and voluntarily waived her constitutional right to a jury trial through a unilateral amendment by

CMCU.

Finally, and to answer the rather simple question posed of this dissent by the majority, recognizing a breach of the implied covenant of good faith and fair dealing in this case would not require the cancellation and renegotiation of every consumer contract in the event an amendment is desired by a service provider. A change in terms that is not retroactive and contains a savings clause does not offend the maxim that an attempt to recapture foregone opportunities breaches the implied covenant. *See, e.g., Peleg*, 140 Cal. Rptr. 3d at 59–62. Service providers might also notice such changes on an opt-*in* rather than opt-*out* basis—or, at a minimum, provide actual clear notice of opt-out rights in a plain and unambiguous manner. *See, e.g., Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 881 (N.D.Ca. 2018) (holding addition of an arbitration clause to Google's AdWords terms of service under a unilateral amendment provision was not illusory or in violation of the implied covenant of good faith and fair dealing where "it provided ample notice to the advertisers, required them to accept or decline, and gave them a valid opportunity to opt out"). Finally, even if the common law of contracts precludes unilateral contract modifications, our legislative branch is well equipped to weigh the interests of businesses and consumers and enact laws that strike the appropriate balance. *See, e.g., March v. First USA Bank, N.A.*, 103 F. Supp. 2d 909, 915 (N.D.Tx. 2000) (enforcing a unilateral arbitration amendment to a credit card agreement where an applicable state statute specifically authorized unilateral arbitration amendments to credit card

agreements).[7]

## II.   Conclusion

"[I]mplicit in every contract is the obligation of each party to act in good faith." *Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 303 N.C. 387, 399 (1981).  The majority's holding in this case functionally erases that obligation in the context of unilateral retroactive amendments to consumer contracts, thereby disrupting the leveling effect of our law on parties that have dramatically different negotiating power.  So now, as long as the original consumer contract touched on the subject of the amendment, the amending party has free rein to make whatever changes it wishes—including relieving itself of any duty to arbitrate while leaving that restriction on the other party.  This is true even when: the lay consumer had no actual notice of the amendment; the amendment itself was unclear as to her ability to opt out; the amendment was retroactive in effect; and the amendment deprived her of constitutional rights previously recognized, protected, and reserved by the original contract.  Like the trial court and the dissent from the Court of Appeals, I would hold the arbitration and class action waiver amendment in this case to be void for these

---

[7] There is, of course, no small irony in claiming this dissent "ignores market realities" while simultaneously presuming that: (a) lay consumers—who frequently do not read or have the education or resources to understand consumer contracts of adhesion—are able to meaningfully shop around for market alternatives whose agreements lack forum selection, arbitration, and unilateral amendment clauses; and (b) enormous—and enormously sophisticated—commercial entities like Amazon, Apple, and Facebook are so helpless as to be unable to imagine these (and perhaps other) alternatives that would accomplish their business objectives without offending basic contract principles of fundamental fairness.

reasons.  I respectfully dissent.


Justice EARLS joins in this dissenting opinion.